## LOUIS BECKENSTEIN ET AL. *v.*
## POTTER AND CARRIER, INC., ET AL.
### (11061)

PETERS, HEALEY, PARSKEY, GRILLO and DUPONT, Js.

Argued April 7—decision released August 16, 1983

*Alexandra Davis,* with whom were *Wesley W. Horton* and, on the brief, *William R. Moller,* for the appellants (plaintiffs).

*John Crosskey,* with whom were *Robert Poyourow* and, on the brief, *David J. Elliott,* for the appellee (defendant General Aniline and Film Corporation).

ARTHUR H. HEALEY, J. In January, 1975, the plaintiffs, Henry and Louis Beckenstein (plaintiffs), filed this action against the defendants, Potter & Carrier, Inc. (Potter & Carrier), and General Aniline & Film Corporation (GAF). The plaintiffs claimed that Potter & Carrier had installed a defective roof on a manufacturing building constructed by the plaintiffs and that the materials for said roof had been manufactured by GAF. The plaintiffs have appealed the court's decision, *Alexander, J.,* sustaining a demurrer to two counts in their original complaint alleging a breach of implied warranty, and the trial court's decision, *Aspell, J.,* to direct a verdict for the defendants on the two counts in their substituted complaint. The first count of the substituted complaint alleged that Potter & Carrier had breached its contract with the plaintiffs by failing to construct the roof in a workmanlike manner. It also alleged that Potter & Carrier was the agent of GAF. The second count in the substituted complaint was based upon product liability.

In June of 1968, the plaintiffs entered into an agreement with Colt Industries, Inc. (Colt), whereby Colt conveyed a parcel of land located in the town of Rocky Hill to the plaintiffs, and the plaintiffs agreed to construct a manufacturing plant which they would then lease to Colt. In addition, Colt was given an option to repurchase both the land and the building under certain conditions. The lease between the parties contained a clause which stated, in part, that the building was to be constructed "substantially in accordance with the

outline plans and specifications agreed upon by the parties." Some of the plans and specifications referred to in the lease were introduced into evidence. Henry Beckenstein also testified that it was his understanding that he was required to construct the building in accordance with these plans and specifications.

The plaintiffs undertook to construct the building through a corporation which they owned, National Building Supply Company. This company acted as the "coordinator" for the project. In addition, the general superintendent[1] for the project was William Muller, one of whose responsibilities was to hire the subcontractors.

On May 29, 1968, Muller entered into a contract with Potter & Carrier to construct the roof of the building for $37,000. One of the plans for the building stated that the roof was to be a "typical roof construction, twenty-year bond." The contract entered into between Muller and Potter & Carrier called for the latter to install, inter alia, a "20 year smooth surface asbestos roof (Bonded)."

As explained by one of the plaintiffs' witnesses, Robert Berryman, a roofing bond was something offered by the manufacturer of roofing materials, whereby, if one paid a premium, the manufacturer would agree to make any repairs on the roof during the period that the bond was in effect. There was also a dollar limit as to how much a manufacturer would be obligated to spend in making any repairs. The bond issued by GAF in this case, for example, was a twenty year bond which bound GAF to make repairs up to a sum not to exceed $8970.

There was no agreement between the plaintiffs and GAF to issue the bond covering the Colt building. Rather, the bond was issued pursuant to an agreement

[1] Henry Beckenstein said that William Muller "was our general superintendent then . . . and still is."

entered into between Potter & Carrier and GAF. This agreement was entitled: "Approved Roofer's Agreement." In order to qualify for a bond pursuant to this agreement, Potter & Carrier had to satisfy certain conditions. For example, it had to notify GAF that it had been awarded a particular job at least two days before it commenced working on such job, as well as sending GAF notice of when it completed the job. In addition, the roofer had to comply with certain specifications of GAF governing the application of a particular roof. One of these conditions was that if GAF determined that any additional work or materials were required, it could direct Potter & Carrier to complete them. Finally, once a bond had been issued, the agreement between Potter & Carrier and GAF required Potter & Carrier to give a two year guarantee to GAF for its workmanship during which time Potter & Carrier was obligated to make all repairs.

Although Potter & Carrier used GAF materials in installing the roof on the Colt building, as noted previously, neither the architectural plans nor Potter & Carrier's contract with Muller called for GAF products. Muller, in fact, testified that there were "several" different kinds of twenty year bonded roofs.

In regard to the date when Potter & Carrier installed the roof, Henry Beckenstein testified that he believed that the roof was completed prior to the end of 1968, and that Colt moved in by the end of 1968 or the beginning of 1969.[2] Muller, the plaintiffs' superintendent for the project, testified that the building was occupied by the end of 1968. The plaintiffs also introduced into evidence five bills submitted to them by Potter & Carrier. The first bill was dated August 21, 1968, and indicated that the roof was 85 percent complete. There was also a bill dated September 18, 1968, and two that

[2] The lease entered into by the plaintiffs and Colt called for construction to be completed by December 31, 1968.

were dated January 27, 1969. The final bill was dated March 26, 1969. The amount of this last bill was only $93.25.

The defendants introduced two certificates of occupancy issued by the building department of the town of Rocky Hill. The first certificate was a temporary certificate and restricted Colt to installing "machinery and/or other equipment." This certificate was dated November 12, 1968. The second certificate was dated January 24, 1969, and stated that the building was "completed."

Finally, the plaintiffs introduced the bond issued by GAF for the building. It stated that the date of completion was March 10, 1970. Henry Beckenstein testified, however, that the bond was received after the roof was completed and that March 10 was not the same date as when it was completed.

Henry Beckenstein testified that "[t]he roof started to leak almost immediately after the building was done. And they were plaguing us every time it rained." The plaintiffs called Potter & Carrier a number of times to try and get it repaired, but "[t]he next rain we had the same calls all over again. We called [Potter & Carrier]. [They] came again. That continued and continued and continued." Muller testified that the first winter, i.e., early 1969, after the roof was completed he went up on the roof and "saw many blisters and cracks. Two cracks, I believe. And what I saw I never seen before was that the cant [a triangle-like piece of wood that goes along the perimeter of the building] had pulled in." Beckenstein also testified that he had a discussion with a representative from GAF, William H. Barnett, and that the "gist" of their conversation was that they "discussed the fallacies of the roof. . . . Mr. Barnett was telling us that the roof was not applied properly . . . ." He was also on the roof when Barnett had

Potter & Carrier cut core samples out of the roof. The plaintiffs then introduced two letters sent by Barnett to Potter & Carrier dated April 30, 1971, and September 9, 1971, in which Barnett stated that the problems were "not normal" but that he did not know what exactly was causing the problems. He also suggested possible steps that could be taken to determine the cause. The plaintiffs also introduced a memorandum from another GAF employee, R.J. Sobol, to Barnett dated May 30, 1972, referring to an inspection of the roof they had made with Potter & Carrier and people representing the plaintiffs. It states, inter alia, that "John [Potter] . . . did promise the owners that he would make whatever repairs necessary to put this roof in shape. . . . In private [Potter] asked me if we would stand part of the cost of these repairs and I reiterated what you told me and him—that it is not the responsibility of the bonding company." Finally, the plaintiffs introduced a letter dated November 1, 1974, from a GAF field sales manager to Barnett's boss indicating that the sales manager had tried to get in touch with the plaintiffs' attorney about setting up a meeting. It states, in part, that GAF has "a Bond issued on the Colt's facility at Rocky Hill and [two GAF employees] have been on this job on numerous occasions."

A meeting was finally held on November 14, 1974, at the request of the plaintiffs' attorney to discuss the roof. At the meeting Barnett indicated that the main problem with the roof was that the insulation, which went underneath the roofing materials manufactured by GAF, was not adhered properly to the steel frame of the building.

Our disposition of the claims raised by the plaintiffs requires that we address these issues: (1) whether the court erred in directing a verdict for the defendants on the breach of contract count based upon its deter-

mination that the claim was barred by the applicable statute of limitations, General Statutes § 52-576; (2) whether the court erred in directing a verdict for the defendants on the product liability count based upon its determination that that claim was also barred by the applicable statute of limitations, Public Acts 1976, No. 76-293; and (3) whether the court erred in sustaining the demurrer.

We now turn to the statute of limitations defense that GAF raised to the plaintiffs' breach of contract claim. General Statutes § 52-576, as it existed at the time of trial, provided in pertinent part that "[n]o action . . . upon any contract in writing, shall be brought but within six years next after the right of action accrues . . . ." In their briefs, both parties state that the date that the writ was served upon the defendants was February 4, 1975. Therefore, the plaintiffs' cause of action was barred unless it "accrued" within six years of that date, i.e., February 4, 1969. See *Broderick* v. *Jackman,* 167 Conn. 96, 99, 355 A.2d 234 (1974).

Both parties also recognize that the law as to when a breach of contract action "accrues" was set out in *Kennedy* v. *Johns-Manville Sales Corporation,* 135 Conn. 176, 180, 62 A.2d 771 (1948). There we stated that "[i]n an action for breach of contract . . . the cause of action is complete at the time the breach of contract occurs, that is, when the injury has been inflicted." Id. We also noted that while "the application of [this] rule may result in occasional hardship," it is well established that ignorance of the fact that damage has been done does not prevent the running of the statute, except where there is something tantamount to a fraudulent concealment of a cause of action. *Kennedy* v. *Johns-Manville Sales Corporation,* supra, 179.

The injury was inflicted in this case when Potter & Carrier completed the roof. Our review of the evidence presented at the trial as set out above establishes that

the trial court was correct in finding that the roof was completed prior to February 4, 1969. The only work undertaken by Potter & Carrier or GAF after that date was in the nature of repairs.

The plaintiffs claim, however, that GAF had a continuing duty in this case. They contend that pursuant to the principles set forth in *Skidmore, Owings & Merrill* v. *Connecticut General Life Ins. Co.,* 25 Conn. Sup. 76, 197 A.2d 83 (1963), this continuing duty extended the period as to when the statute of limitations began to run. We find that the principles set out in that case are inapplicable to the facts presented here.

In the *Skidmore, Owings & Merrill* case, the court was faced with a contract for the provision of architectural services in constructing a building. As the court specifically noted, "[u]nder the agreement, [Skidmore, Owings & Merrill (Skidmore)] was given responsibility for *each phase* of the planning and construction . . . and was given the duty of *complete supervision* over the course of the 'Work.' " (Emphasis added.) Id., 78. A defect arose in the heating, ventilating and air-conditioning system (HVAC), bids for which had been submitted in early 1955. The defendant occupied the building in early 1957, discovered the defect in 1960, and brought an action to arbitrate the dispute in 1962. Skidmore contended that the submission of bids in 1955, which was also when the work was done, tolled the statute. The court disagreed on the basis of its finding that, under the contract, the plaintiff remained in control of the work and had a continuing duty to condemn work it considered unfit. Id., 92–94.

In the present case, the plaintiffs contend that, pursuant to the bond it had issued for the roof, GAF had a continuing duty to repair the roof during the twenty year life of the bond. We disagree. As the plaintiffs'

claim recognizes, GAF was not in control of the work performed on the roof as a result of the contract between the plaintiffs and Potter & Carrier. Rather, its obligations arose as a result of the completely separate undertaking between itself and Potter & Carrier. If this were an action on the bond, the result may have been different. See *Bulova Watch Co.* v. *Celotex Corporation,* 46 N.Y.2d 606, 610–11, 389 N.E.2d 130 (1979); cf. *Grand Island School District* v. *Celotex Corporation,* 203 Neb. 559, 568, 279 N.W.2d 603 (1979). Under the contract between the plaintiffs and Potter & Carrier, however, the injury was inflicted when the defective roof was completed. Potter & Carrier and the plaintiffs had contracted for the "performing of a specific, definable act," i.e., the construction of a roof. See *Skidmore, Owings & Merrill* v. *Connecticut General Life Ins. Co.,* supra, 93. That came about when Potter & Carrier completed the roof. At that time neither Potter & Carrier nor, certainly, GAF had any "continuing, indivisible responsibility for the attainment of an end result." *Skidmore, Owings & Merrill* v. *Connecticut General Life Ins. Co.,* supra.

The plaintiffs' second contention in regard to the statute of limitations defense is that because Potter & Carrier and GAF "continued" to work on the roof after 1969, "the Plaintiffs should not have been required to sue GAF during the period when GAF was supposedly trying to rectify the problem in order to avoid a lawsuit." The problem with this claim is that the plaintiffs have cited no evidence that the defendants were making the repairs "in order to avoid a lawsuit." We note that courts are not in agreement as to whether repairs in this general type of case do toll the statute of limitations. Compare *Boykins Narrow Fabrics Corporation* v. *Weldon Roofing & Sheet Metal, Inc.,* 221 Va. 81, 84–85, 266 S.E.2d 887 (1980) (repairs by roofer do not

toll statute absent basis for estoppel or fraud); *Mason* v. *County of Mobile,* 410 So. 2d 19, 21 (Ala. 1982) (repairs to damaged pipe toll statute where there is reliance by the consumer); and *Carlson* v. *Ray Geophysical Division,* 156 Mont. 450, 452–53, 481 P.2d 327 (1971) (repairs without proof of fraudulent concealment do not toll statute); with *Little Rock School District* v. *Celotex Corporation,* 264 Ark. 757, 767, 574 S.W.2d 669 (1978) (whether repairs toll statute is a question of fact for the jury); cf. *Cacace* v. *Morcaldi,* 37 Conn. Sup. 735, 738, 435 A.2d 1035 (1981).

We believe that, under the circumstances of this case, the better rule to apply is that the party trying to overcome a statute of limitations defense must, at least, allege actual reliance upon the repairs being made as the basis for not filing a lawsuit. The plaintiffs have not done so. This conclusion is guided by certain factors. First, had GAF not made any repairs on the roof, then, in all likelihood, it could have been liable on the bond. The plaintiffs point to no evidence that shows that in carrying out its repairs GAF had done anything other or different than it had undertaken to do for Potter & Carrier under the bond issued by them. For such repairs to constitute a circumstance tolling the statute would place GAF in a classic "Catch 22" position, i.e., either the statute is tolled if repairs are made or GAF is liable on the bond if repairs are not made. In addition, we have previously noted the hardship that failure to observe the statute of limitations may impose. See *Kirwan* v. *State,* 168 Conn. 498, 501, 363 A.2d 56 (1975); *Kennedy* v. *Johns-Manville Sales Corporation,* supra. In the final analysis, the policy of statutes of limitation includes promoting " 'repose by giving security and stability to human affairs.' " *Much* v. *Sturm, Ruger & Co.,* 502 F. Sup. 743, 745 (D. Mont. 1980). We have also stated that "it is not the function

of this court to pass upon the merit of legislation."
*Kirwan* v. *State,* supra. This latter comment is espe-
cially pertinent in light of the fact that the legislature
has specifically delineated a number of instances where
the statute of limitations will be tolled. See General
Statutes §§ 52-592 through 52-595. We cannot con-
clude, therefore, that making repairs, in themselves,
tolls the statute of limitations.

Finally, the plaintiffs claim that GAF should be
estopped from denying that the roof was completed
before February 4, 1969, when the bond it issued stated
that the date of completion was March 10, 1970. This
claim is without merit for two reasons. First, we have
already noted that the bond is issued pursuant to a com-
pletely separate agreement between Potter & Carrier
and GAF. Issuing the bond is not a guarantee that the
roof is not defective; rather, it obligates GAF to make
certain repairs under certain circumstances. In addi-
tion, Henry Beckenstein explicitly stated that the date
on the bond was incorrect. The plaintiffs, therefore,
did not rely on this date in delaying the filing of this
action. This factor would have been an essential ele-
ment for asserting a claim of estoppel. See *Zoning Com-
mission* v. *Lescynski,* 188 Conn. 724, 731, 453 A.2d
1144 (1982); *Boykins Narrow Fabrics Corporation* v.
*Weldon Roofing & Sheet Metals, Inc.,* supra.

We conclude that the trial court did not err in direct-
ing a verdict in favor of the defendants based on its
determination that the breach of contract claim was
barred by the statute of limitations.

The second issue presented by this appeal is whether
the trial court erred in directing a verdict for the
defendants on the product liability count on the ground
that it was barred by the statute of limitations. The
applicable statute of limitations was General Statutes

§ 52-577a, as set forth in Public Acts 1976, No. 76-293,[3] which stated in pertinent part that "[n]o action to recover damages for injury . . . to real or personal property caused by any product in a defective condition shall be brought against one who manufactures . . . any such product but within three years from the date when the injury is first sustained, discovered or in the exercise of reasonable care should have been discovered." The plaintiffs raise two claims in regard to this count. First, they claim that the defect in the roof was a continuing one. Alternatively they suggest that the defendants tolled the statute through the fraudulent concealment of the plaintiffs' cause of action.

In *Giglio* v. *Connecticut Light & Power Co.*, 180 Conn. 230, 429 A.2d 486 (1980), we stated that "[w]hen the wrong sued upon consists of a continuing course of conduct, the statute does not begin to run until that course of conduct is completed." Id., 241, quoting *Handler* v. *Remington Arms Co.*, 144 Conn. 316, 321, 130 A.2d 793 (1957). In *Giglio,* we noted that the continuing defect was the defendant's failure to give an adequate warning that a furnace it had converted in 1959 gave rise to an unreasonably dangerous condition. *Giglio* v. *Connecticut Light & Power Co.*, supra, 237. Because of this continuing defect, we held that even though the furnace was converted in 1959, and the injury occurred in 1967, a suit filed in 1968 was not barred by the statute of limitations. Id., 242.

---

[3] The defendants raise a question as to the applicability of this statute in light of the federal district court's decision in *Ferguson* v. *Sturm, Ruger & Co.*, 524 F. Sup. 1042 (D. Conn. 1981). In that case, the court found that General Statutes § 52-577a as it existed in 1976 would have been unconstitutional if the court had applied it to the facts of that case. Id., 1045-46. It did not, however, hold the statute unconstitutional. The same constitutional issues do not apply to the present case.

The plaintiffs misconceive the import of the *Giglio* case. The continuing conduct in that case was the failure of the defendants to warn the plaintiff of the danger of the furnace. In contrast, the defect in the present case does not involve a failure to warn; rather, the defect consists of the failure of the roof. Both Henry Beckenstein and William Muller testified that the roof started to leak "almost immediately." Muller also testified that when he went up on the roof in the winter of early 1969, he observed blisters, cracks and canting of the roof. There was not a failure to warn the plaintiffs because they admit that they were already aware of the problem. In their brief, the plaintiffs argue that they were not told the "main problem" of the roof's failure until 1974. *Mansfield* v. *GAF Corporation,* 5 Mass. App. 551, 554, 364 N.E.2d 1292 (1977). The problem with this argument is that the statute refers to the "date when the injury was first sustained," not the date when the cause of the injury was first determined. The same reasoning led to the holding that was reached in *Grand Island School District* v. *Celotex Corporation,* supra, 566–67. See also *Friends University* v. *W. R. Grace & Co.,* 227 Kan. 559, 564–65, 608 P.2d 936 (1980); *Unified School District No. 490* v. *Celotex Corporation,* 6 Kan. App. 2d 346, 352–53, 629 P.2d 196 (1981); *Mansfield* v. *GAF Corporation,* supra, 554–55; but see *Cartmell* v. *Slavik Company,* 68 Mich. App. 202, 206, 242 N.W.2d 66 (1976).

The plaintiffs' second claim in regard to the product liability count is the suggestion that the statute was tolled by the conduct of the defendants in fraudulently concealing the fact that the plaintiffs had a potential cause of action against them. General Statutes § 52-595 provides that "[i]f any person, liable to an action by another, fraudulently conceals from him the existence of the cause of such action, such cause of action shall

be deemed to accrue against such person so liable therefore at the time when the person entitled to sue thereon first discovers its existence." Because the date of discovery is the relevant time period, what we said in regard to the plaintiffs' first argument on this count would be applicable here. See also *Robbins* v. *McGuinness,* 178 Conn. 258, 262, 423 A.2d 897 (1979); *Friends University* v. *W. R. Grace & Co.,* supra. Moreover, "[f]raud is not to be presumed, but must be strictly proven. The evidence must be clear, precise, and unequivocal." *Puro* v. *Henry,* 188 Conn. 301, 308, 449 A.2d 176 (1982). In any event, this claim, even if it had any merit or basis, is not properly before this court. In order to raise a claim of fraudulent concealment, the party challenging a statute of limitations defense must affirmatively plead it. *D'Occhio* v. *Connecticut Real Estate Commission,* 189 Conn. 162, 182–83, 455 A.2d 833 (1983); *Rosenblatt* v. *Berman,* 143 Conn. 31, 40, 119 A.2d 118 (1955). In the present case, the reply filed by the plaintiffs contained a general denial of the defense. This was insufficient. Id.

In summation, although we continue to recognize that directed verdicts "are not generally favored"; *Sestito* v. *Groton,* 178 Conn. 520, 522, 423 A.2d 165 (1979); *Cruz* v. *Drezek,* 175 Conn. 230, 232, 397 A.2d 1335 (1978); *Mott* v. *Hillman,* 133 Conn. 552, 555, 52 A.2d 861 (1947); and that this court must consider all the evidence in the light most favorable to the plaintiffs; *Sestito* v. *Groton,* supra; we cannot conclude that the trial court erred in directing a verdict in favor of the defendants on the two counts of the plaintiffs' substituted complaint.

The plaintiffs' final claim is that the trial court erred in sustaining a demurrer to the second and third counts of their original complaint. The second count alleged that GAF had breached its implied warranty that the

roofing system it had manufactured was fit for its intended purpose, while the third count alleged a breach of implied warranty of merchantability. The trial court held that the contract entered into between the plaintiffs and Potter & Carrier was not an agreement for the sale of goods, but was a contract for labor and materials to which no warranties attached under the Uniform Commercial Code (UCC). General Statutes §§ 42a-2-313 through 42a-2-315.

On appeal, the plaintiffs argue that the roofing "system" that was installed by Potter & Carrier and manufactured by GAF should be considered the sale of a product for the purpose of determining whether a warranty attached to it. They further contend that even if the warranties provided for by the UCC are inapplicable, the complaint is not limited to statutory warranties; rather, it raises an issue of warranty under Connecticut case law. See generally *Cacace* v. *Morcaldi,* supra; *Milau Associates* v. *North Avenue Development Corporation,* 42 N.Y.2d 482, 485, 368 N.E.2d 1247 (1977).

Even if we were to agree with the plaintiffs' arguments, any error on the part of the trial court would be harmless because the claims would still be barred by the statute of limitations. Under the common law theories, the breach of warranty claims would be controlled by the statute of limitations applicable to contracts; *Cacace* v. *Morcaldi,* supra; or would be controlled by the statute of limitations applicable to tort actions. See *Bulova Watch Co.* v. *Celotex Corporation,* supra, 610. We have already disposed of the contract issue.

The statute governing tort actions; General Statutes § 52-577; provides that "[n]o action founded upon a tort shall be brought but within three years from the date

of the act or omission complained of." We have already noted the "act or omission complained of" was not a failure to notify the plaintiffs; see *Robbins* v. *McGuinness,* supra, 261; rather, it was the improper installation of the roof itself. Therefore, the plaintiffs' action would also be time-barred on this ground.

Finally, General Statutes § 42a-2-725 is the applicable statute of limitations for breach of warranty claims brought under the UCC. That statute provides in part: "(1) An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. . . . (2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made . . . ." Here, the roofing "system" was tendered at the latest by the end of 1968, and suit was not brought until February 4, 1975. Therefore, we cannot conclude that the trial court erred in sustaining the defendants' demurrer.

There is no error.

In this opinion the other judges concurred.